Robert H. SWAN, Appellant,

v.

**William J. CLINTON, in his official capacity as President of the United States of America, et al., Appellees.**

No. 96–5193.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 13, 1996.

Decided Nov. 22, 1996.

974

Richard K. Willard, Washington, DC, argued the cause for appellant, with whom Brian J. Leske was on the briefs.

Douglas N. Letter, Litigation Counsel, United States Department of Justice, Washington, DC, argued the cause for appellees, with whom Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, and Stephen W. Preston, Deputy Assistant Attorney General, were on the brief.

Before: WALD, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Concurring opinion filed by Circuit Judge SILBERMAN.

WALD, Circuit Judge:

On April 9, 1996, President Clinton removed appellant Robert H. Swan ("Swan") from his position as a member of the Board of the National Credit Union Administration ("NCUA") and, using his recess appointment clause powers, appointed Yolanda T. Wheat ("Wheat") to take Swan's place. Swan seeks to have his removal and Wheat's appointment declared unlawful and to be reinstated as a Board member. The district court granted summary judgment in favor of the government, and we affirm.

I. BACKGROUND

The NCUA is entrusted with the responsibility of overseeing federally chartered credit unions and administering the credit union insurance and liquidity funds. 12 U.S.C. § 1752a et seq. (1994). The task of credit union oversight traveled the agency circuit for many years after the passage of federal credit union legislation in 1934. It was first lodged with the Farm Credit Administration, moved to the Federal Deposit Insurance Corporation ("FDIC") in 1941, then to the Federal Security Agency in 1948 and was assigned to a bureau within the Department of Health, Education, and Welfare in 1949 when the Federal Security Agency was absorbed into that department. Finally, in 1970 Congress created the NCUA via amendments to the Federal Credit Union Act ("NCUA statute" or "Act") and made credit union supervision its sole responsibility. See 12 U.S.C. § 1752a (Prior Provisions); Restructuring the National Credit Union Administration: Hearings Before the Subcomm. on Financial Insts. of the Senate Comm. on Banking, Housing and Urban Affairs, 94th Cong., 2d Sess. 18 (1976) (statement of the Credit Union National Association, Inc.).

The NCUA was denominated an independent agency in the executive branch, and in its initial form was led by a single Administrator with assistance from an advisory board

composed of a Chairman and one member from each of the federal credit union regions. The Administrator and all of the advisory board members were to be appointed by the President, by and with the advice and consent of the Senate. The Administrator and the Chairman of the advisory board were also described as serving "at the pleasure of the President." Act of March 10, 1970, Pub.L. No. 91–206, 84 Stat. 49, 49–50 (1970) (establishing the NCUA); *see also* H.R.Rep. No. 1383, 95th Cong., 2d Sess. 138 (1978) (setting out text of NCUA statute prior to amendment). The term of office for advisory board members other than the Chairman was six years, and the Act further provided that "[a]ny member of the board may continue to serve as such after the expiration of his term of office until his successor has been appointed and has qualified." *Id.*

In 1978, Congress enacted the Financial Institutions Regulatory and Interest Rate Control Act of 1978 ("FIRIRCA"), Title V of which again amended the NCUA statute and created the NCUA organizational structure that remains in force today. The 1978 amendments replaced the NCUA Administrator and advisory board with a new NCUA Board that was given authority to manage the agency. The NCUA Board consists of three members, each appointed by the President, by and with the consent of the Senate, for a term of six years. The President designates who shall serve as NCUA Chairman when he appoints members to the Board. The regional representation requirement of the earlier advisory board was dropped; instead NCUA Board members must simply be broadly representative of the public interest and no more than two members can belong to the same political party. Congress staggered the terms so that every two years a member's term expires, and only Board members who were appointed to finish unexpired terms or were initially appointed for less than a full six year term can be reappointed. In addition, a holdover clause provides that Board members can continue to serve after their terms have expired until their successors have "qualified." 12 U.S.C. § 1752a(c).

At the same time as it restructured the NCUA, Congress also expanded its responsibilities. In 1970, soon after the NCUA was established, Congress created the National Credit Union Share Insurance Fund, which insures the accounts of federally chartered credit unions and of many state chartered credit unions, and made the NCUA responsible for its administration. 12 U.S.C. §§ 1781–1790(c). In 1978, as Title XVIII of FIRIRCA, Congress established the National Credit Union Central Liquidity Facility, which advances funds to member credit unions so that they are able to meet their liquidity needs, and again gave the NCUA the responsibility of managing the new facility. 12 U.S.C. §§ 1795–1795k. Overseeing federally chartered credit unions and administering the Insurance Fund and the Liquidity Facility are currently the three functions of the NCUA.

On April 5, 1990, President Bush appointed and the Senate confirmed Swan to serve as a Democratic member of the NCUA Board. Swan's term expired in August, 1995 and he continued to serve as a holdover member. By letter dated April 8, 1996, defendant Robert J. Nash ("Nash"), an Assistant to the President of the United States, informed Swan that President Clinton had decided to remove Swan from his position as a member of the NCUA Board, effective at close of business on April 9, 1996. Swan protested that he intended to remain in office, whereupon defendant Karl T. Hoyle ("Hoyle"), the Executive Director of the NCUA, ordered Swan to vacate his office. The Senate was out of session from March 29 until April 15, 1996. On April 12, 1996, President Clinton exercised his recess appointment clause power and appointed Wheat to fill Swan's seat on the NCUA Board. President Clinton had previously nominated Wheat to replace Swan in November, 1995 but the Senate had not yet acted on the nomination, nor has the Senate done so since.

█ On April 23, Swan sued President Clinton, Nash and Hoyle, seeking to have his removal and Wheat's appointment declared unlawful and to obtain injunctive relief ordering his reinstatement as a member of the NCUA Board. Swan argued that the NCUA

statute prohibits the President from removing a Board member without cause, either during the member's term of office or when the member is serving in a holdover capacity. After Swan's motion for a preliminary injunction was consolidated with trial on the merits, the government and Swan cross-moved for summary judgment. On June 21, 1996, the district court granted summary judgment in favor of the government, holding that the NCUA statute did not restrict the President's authority to remove members of the NCUA Board. We review the district court's grant of summary judgment *de novo* as it was based on a pure question of law. *American Legion v. Derwinski*, 54 F.3d 789, 795 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 697, 133 L.Ed.2d 655 (1996).

## II. JURISDICTION

Before turning to an analysis of the NCUA statute to determine whether it restricts the President's removal powers, we first take up the even more basic and troubling question of whether this court has jurisdiction to hear Swan's appeal. In order for there to be an Article III case or controversy over which this court can exercise jurisdiction, Swan must have standing. As the Supreme Court has stated,

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between

the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992) (footnote, citations, and internal quotations omitted); *see also Franklin v. Massachusetts*, 505 U.S. 788, 801, 112 S.Ct. 2767, 2775–76, 120 L.Ed.2d 636 (1992) (plurality opinion) ("To invoke the constitutional power of the federal courts to adjudicate a case or controversy under Article III, appellees here must allege and prove an injury 'fairly traceable to the [appellants'] allegedly unlawful conduct and likely to be redressed by the requested relief.' ") (alterations in original) (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984)). For the purposes of determining standing, we "assume the validity of a plaintiff's substantive claim." *Catholic Social Serv. v. Shalala*, 12 F.3d 1123, 1126 (D.C.Cir.1994); *see also Warth v. Seldin*, 422 U.S. 490, 500–01, 95 S.Ct. 2197, 2205–07, 45 L.Ed.2d 343 (1975).

In this case, it is the third "redressability" element of standing that initially causes some concern; assuming that Swan is correct and the NCUA statute prohibited his removal, there is no doubt that this removal caused Swan to suffer a concrete and actual injury. A question exists, however, as to whether a federal court has the power to grant injunctive relief against the President of the United States in the exercise of his official duties.[1]

---

1. Swan seeks declaratory relief based on the declaratory judgment statute, 28 U.S.C. §§ 2201–02, as well as injunctive relief based on the general federal question statute and the mandamus statute, 28 U.S.C. §§ 1331, 1361. Although the following discussion is couched in terms of our ability to grant injunctive relief against the President, similar considerations regarding a court's power to issue relief against the President himself apply to Swan's request for a declaratory judgment. In addition, we note that a request for an injunction based on the general federal question statute is essentially a request for a writ of mandamus in this context, where the injunction is sought to compel federal officials to perform a statutorily required ministerial duty, *National Wildlife Fed'n v. United States*, 626 F.2d 917, 918 n. 1 (D.C.Cir.1980); *see also* P. Bator et

al., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 998–99 (4th ed.1996) (request for mandatory injunction generally judged by same principles as request for mandamus), and that the declaratory judgment statute does not constitute an independent grant of jurisdiction, *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 672, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950). The necessary prerequisites for this court to exercise its mandamus jurisdiction are that "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *American Cetacean Soc'y v. Baldrige*, 768 F.2d 426, 433 (D.C.Cir.1985), *rev'd on other grounds sub nom. Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986); *Heckler v. Ringer*, 466 U.S.

The Supreme Court has confirmed that a "grant of injunctive relief against the President himself is extraordinary, and should ... raise[ ] judicial eyebrows." *Franklin,* 505 U.S. at 802, 112 S.Ct. at 2776. *Franklin* involved a challenge to the methodology by which overseas federal employees were allocated to different states in the 1990 census, which in turn determined how seats in the House of Representatives would be reapportioned. Under the automatic reapportionment statute, the Secretary of Commerce is required to perform the census and report the data to the President, who within nine months is required to transmit a statement to Congress indicating the number of Representatives to which each state is entitled based on the census data. The plaintiffs in *Franklin* sued both the Secretary of Commerce and the President seeking injunctive and declaratory relief. The plurality opinion of the Court concluded that "in general, 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties,'" and a majority of the Justices in fact subscribed to this position. *Id.* at 802–03, 112 S.Ct. at 2776–77 (quoting *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 501, 18 L.Ed. 437 (1866)); *see also id.* at 826, 112 S.Ct. at 2788–89 (Scalia, J., concurring in part and concurring in the judgment) ("I think it clear that no court has authority to direct the President to take an official act.").[2]

*Franklin* does not, however, directly decide the question of whether this court has the power to grant Swan the injunctive relief he seeks, because the plurality opinion there specifically noted that the Court had "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministe-

rial' duty." *Id.* at 802, 112 S.Ct. at 2776 (quoting *Mississippi,* 71 U.S. (4 Wall.) at 498–99). A ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty. *Mississippi,* 71 U.S. (4 Wall.) at 498 ("a ministerial duty ... is one in respect to which nothing is left to discretion"); *see also Beatty v. Washington Metro. Area Transit Auth.,* 860 F.2d 1117, 1127 (D.C.Cir.1988) (" 'Generally speaking, a duty is discretionary if it involves judgment, planning, or policy decisions. It is not discretionary [i.e. ministerial] if it involves enforcement or administration of a mandatory duty at the operational level' ") (alteration in original and emphasis omitted) (quoting *Jackson v. Kelly,* 557 F.2d 735, 737–38 (10th Cir.1977)). The distinction between discretionary and ministerial duties is also critical in this case because the courts do not have authority under the mandamus statute to order *any* government official to perform a discretionary duty. *Heckler,* 466 U.S. at 616, 104 S.Ct. at 2022; *13th Regional Corp. v. United States Dep't of Interior,* 654 F.2d 758, 760 (D.C.Cir.1980).

Swan alleges that the President violated a duty to comply with removal restrictions contained in the NCUA statute and not interfere with Swan's holdover status until Swan's successor had "qualified." This duty, if it exists, is ministerial and not discretionary, for the President is bound to abide by the requirements of duly enacted and otherwise constitutional statutes. *See* U.S. CONST. art. II, § 3, cl. 3 (the President "shall take Care that the Laws be faithfully executed"); *Kendall v. United States,* 37 U.S. (12 Pet.) 524, 613, 9 L.Ed. 1181 (1838) ("To contend that the obligation imposed on the President to see the

---

602, 616–17, 104 S.Ct. 2013, 2022–23, 80 L.Ed.2d 622 (1984); *see also Willis v. Sullivan,* 931 F.2d 390, 395–96 (6th Cir.1991) (clarifying that these requirements go to court's jurisdiction under mandamus statute, although often discussed in merits terms as to whether a writ of mandamus should be issued); *Carpet, Linoleum & Resilient Tile Layers v. Brown,* 656 F.2d 564, 567–69 (10th Cir.1981) (same); *Cook v. Arentzen,* 582 F.2d 870, 876–77 (4th Cir.1978) (same). We find that these prerequisites for stating a cause of action under the mandamus statute are met in this case, and the primary issues before us are whether this court can grant this remedy against

the President or whether injunctive relief against subordinate executive branch officials sufficiently redresses Swan's injury so as to satisfy the redressability requirement of standing.

2. Although Justice Scalia agreed with the plurality opinion that injunctive relief was not available against the President in the performance of his official duties, he dissented from the plurality's finding that the redressability requirements of standing were met. *Franklin,* 505 U.S. at 824–25, 112 S.Ct. at 2787–88.

laws faithfully executed implies a power to forbid their execution, is a novel construction of the Constitution, and entirely inadmissible"); *Chamber of Commerce v. Reich,* 74 F.3d 1322, 1332 (D.C.Cir.1996) (denying that the President can "bypass scores of statutory limitations on governmental activity"); *NTEU v. Nixon,* 492 F.2d 587, 604 (D.C.Cir. 1974) (the President may not refrain from executing laws duly enacted by the Congress as those laws are construed by the judiciary). The government, on the other hand, argues that since the NCUA statute nowhere expressly limits the President's removal power, the statute cannot impose a nonremoval duty of sufficient clarity to create a ministerial duty. We disagree with that part of the government's argument. As we have stated often in the mandamus context, a ministerial duty can exist even "where the interpretation of the controlling statute is in doubt," provided that "the statute, once interpreted, creates a peremptory obligation for the officer to act." *13th Regional Corp.,* 654 F.2d 758 at 760; *see also American Cetacean Soc'y,* 768 F.2d at 433 (D.C.Cir.1985) (" 'If, after studying the statute and its legislative history, the court determines that the defendant official has failed to discharge a duty which Congress intended him to perform, the court should compel performance, thus effectuating the congressional purpose.' ") (quoting *Estate of Smith v. Heckler,* 747 F.2d 583, 591 (10th Cir.1984)).

We have, however, never attempted to exercise power to order the President to perform a ministerial duty. Earlier decisions of this circuit asserted the authority to issue such an order, but declined to exercise the power so claimed. For example, in *NTEU,* the court held that it had jurisdiction to issue a writ of mandamus directing the President to perform his ministerial duty, as set out in the Federal Pay Comparability Act, to adjust the pay of federal employees. But the court decided to issue declaratory relief instead, stating that simply because the court "possesses the authority to mandamus the President to perform the ministerial duty involved herein does not mean that this Court must or should exercise that authority." 492 F.2d at 616; *see also National Wildlife Fed'n,* 626 F.2d at 923. It is not entirely clear, of course, whether, and to what extent, these decisions remain good law after *Franklin.* For while the Court in *Franklin* explicitly left open the question of whether a court may enjoin the President to perform a ministerial duty, it also issued a stern admonition that injunctive relief against the President personally is an extraordinary measure not lightly to be undertaken. The reasons why courts should be hesitant to grant such relief are painfully obvious; the President, like Congress, is a coequal branch of government, and for the President to "be ordered to perform particular executive ... acts at the behest of the Judiciary," *Franklin,* 505 U.S. at 827, 112 S.Ct. at 2789 (Scalia, J., concurring in part and concurring in the judgment), at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers.

On the other side of the scale, of course, is the bedrock principle that our system of government is founded on the rule of law, and it is sometimes a necessary function of the judiciary to determine if the executive branch is abiding by the terms of legislative enactments. In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials. *See, e.g., Franklin,* 505 U.S. at 803, 112 S.Ct. at 2776–77 (injury caused by use of allegedly unlawful method for including overseas federal employees in the 1990 census can be redressed by declaratory relief against the Secretary of Commerce); *Reich,* 74 F.3d at 1328, 1331 n. 4 (challenge to an executive order does not raise issue of whether judicial power can be brought "to bear directly on the President" where challenge targeted Secretary of Commerce's regulations implementing the executive order and thus represented "a claim directed at a subordinate executive official"); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 811 n. 17, 102 S.Ct. 2727, 2734 n. 17, 73 L.Ed.2d 396 (1982) ("Suits against other officials—including Presidential aides—generally do not invoke separation-of-powers consid-

erations to the same extent as suits against the President himself.") If Swan's injury can be redressed by injunctive relief against subordinate officials, he clearly has standing; moreover, this approach would make it unnecessary to determine whether, in light of *Franklin,* the President can be enjoined to perform a ministerial duty.

 At first glance, it might appear that this case represents one of those rare instances where the bypass is closed, and only injunctive relief against the President himself will redress Swan's injury, because only the President has the power to remove or reinstate NCUA Board members. Although the removal power is nowhere specifically set out in the Constitution, the Supreme Court has established that the President exercises this power as a result of his constitutional appointment power and obligation to take care that the laws are faithfully executed. *See generally Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). NCUA Board members are entrusted with broad regulatory powers over the credit union system and given substantial discretion to determine how best to meet their statutory responsibilities. It thus seems likely that NCUA Board members are principal officers of the United States, and as such they must be appointed, and removed, by the President. *Morrison v. Olson,* 487 U.S. 654, 670–73, 108 S.Ct. 2597, 2608–10, 101 L.Ed.2d 569 (1988). In any event, "as a matter of statutory interpretation, ... absent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'" *Carlucci v. Doe,* 488 U.S. 93, 99, 109 S.Ct. 407, 411, 102 L.Ed.2d 395 (1988) (quoting *Keim v. United States,* 177 U.S. 290, 293, 20 S.Ct. 574, 575, 44 L.Ed. 774 (1900)). Consequently, NCUA Board members can only be removed by the President, even if they are not principal officers, as the NCUA statute gives the President the power to appoint them and is silent on removal. Moreover, the President's exercise of his removal power requires no aid of subordinate officials; in this case, Nash and Hoyle were instrumental in enforcing Swan's removal from office but their involvement was not necessary for the President to officially remove Swan.

But the critical question in determining redressability is not whether subordinate officials have the legal power to remove or reinstate NCUA Board members. It is rather whether injunctive relief against such officials alone could provide Swan with an adequate remedy, despite the fact that only the President has the power to officially remove Wheat and reinstate Swan. An examination of the actions that subordinate officials could perform in Swan's case demonstrates that injunctive relief against such officials could substantially redress his injury.

 Swan has sued not only the President, but also Nash and Hoyle. There is little that Nash could do that would achieve the ends Swan seeks, since Nash, as Assistant to the President, has no authority to control NCUA operations. But Hoyle is another story. As Executive Director of the NCUA, he has responsibility for coordinating the activities of the senior executive staff of the NCUA, and thus could direct the staff to treat Swan as a Board member. 12 C.F.R. § 790.2(b)(7) (1996). However, Hoyle does not appear to have the authority to order the other Board members to treat Swan as a Board member; under the NCUA statute, the Board "shall adopt such rules as it sees fit for the transaction of its business and shall keep ... records of its acts and proceedings." 12 U.S.C. § 1752a(d). The NCUA statute also specifies that "[t]he Chairman of the Board shall be the spokesman for the Board and shall represent the NCUA in its official relations with other branches." *Id.* § 1752a(e). In addition, the regulation setting forth the organization of the NCUA states that the Secretary of the Board, who is not listed as a member of the senior executive staff, is responsible for preparing and maintaining the minutes of the Board's official actions. 12 C.F.R. §§ 790.2(b)(2), 790.2(b)(7). Although Swan has not included the Chairman, other NCUA Board members or the Board Secretary as defendants in this action, it seems indisputable that he would have done so had he thought that suit against the President, Nash, and Hoyle would not be sufficient to provide the relief he desires. At oral argu-

ment Swan's counsel asked that we read Swan's request "for such additional relief as the court shall deem just and proper" to encompass relief against subordinate branch officials not named as parties. Indeed, the Supreme Court has held that a court has power under the All Writs Act to issue commands that apply to "persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." *United States v. New York Tel. Co.,* 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977); *see also* 28 U.S.C. § 1651(a). Thus, we think that it would elevate form over substance in a case of this dimension not to treat Swan's complaint as if it also sought injunctive or declaratory relief against these individuals in their official capacity.[3] Injunctive relief against Hoyle and these added defendants could on balance substantially redress Swan's injury and is sufficient to satisfy the redressability requirement of standing. While these officials cannot officially remove Wheat and reinstate Swan, they can accomplish these deeds *de facto* by treating Swan as a member of the NCUA Board and allowing him to exercise the privileges of that office—*i.e.,* including Swan in Board meetings, giving him access to his former office, recording his votes as official votes of a Board member, allowing him to draw the salary of a Board member, *etc.*—and by denying any such treatment to Wheat.

It is true that resuming his seat on the Board in this *de facto* fashion might not be as complete a remedy for Swan as an official reinstatement by the President. We also acknowledge that the President, who would not be legally bound by any such decision, might raise obstacles to meaningful relief for Swan were he to insist that Wheat and not Swan occupy the position of NCUA Board member or instruct the Treasury Department not to pay Swan's salary. The plurality opinion in *Franklin* addressed this problem of the President's power to ignore the Court's decision by stating that "we may assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination." *Id.* at 803, 112 S.Ct. at 2777. Justice Scalia, on the other hand, considered the plurality's "speculation about the probability of such 'practical' subservience" to be "disrespectful of a coordinate branch." *Id.* at 825, 112 S.Ct. at 2788. We need not decide between these polar views. Instead, we hold that the partial relief Swan can obtain against subordinate executive officials is sufficient for redressability, even recognizing that the President has the power, if he so chose, to undercut this

---

3. This court has authority to amend Swan's complaint in this fashion. Under 28 U.S.C. § 1653, "[d]efective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." *See Goble v. Marsh,* 684 F.2d 12, 17 (D.C.Cir.1982) (in section 1653 "Congress intended to permit amendment broadly to avoid dismissal of suits on technical grounds"). The Supreme Court has also added parties on appeal under the authority of Rule 21 of the Federal Rules of Civil Procedure, which provides that "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action on such terms as are just." *Mullaney v. Anderson,* 342 U.S. 415, 417, 72 S.Ct. 428, 430, 96 L.Ed. 458 (1952) (noting that "Rule 21 will rarely come into play at this stage of a litigation" but granting petitioner's motion to add parties on the grounds that "[t]o dismiss the present petition and require the new plaintiffs to start over in the District Court would entail needless waste"); *see also CP Nat'l Corp. v. Bonneville Power Administration,* 928

F.2d 905, 911–12 (9th Cir.1991) (on appeal joining power agency as a necessary party under Federal Rule of Civil Procedure 19). Since the NCUA Chairman, other Board members and Secretary of the Board are all government officers who, if added, would be sued in their official capacity and would be represented by the Attorney General and United States Attorney as are President Clinton, Nash, and Hoyle, we need not be concerned that they might suffer prejudice by being added as defendants at this point in the proceedings. *See, e.g.,* FED.R.CIV.P. 15(c) (amendment changing a party relates back to date of the original pleading if party being added is an officer of the United States and process was timely filed on, among others, the United States Attorney and the Attorney General); *Sims v. Florida Dep't of Highway Safety & Motor Vehicles,* 862 F.2d 1449, 1460 n. 16 (11th Cir.1989) (no prejudice to state officials from being added as defendants late in course of lawsuit where state attorney general has represented state's interest throughout litigation).

relief. We do not believe that in so holding we are performing an end run around the redressability requirement of standing doctrine. Rather, we are simply recognizing that such partial relief is sufficient for standing purposes when determining whether we can order more complete relief would require us to delve into complicated and exceptionally difficult questions regarding the constitional relationship between the judiciary and the executive branch.

■ Finally, sovereign immunity does not act as a bar to our exercising jurisdiction over Swan's claims. Neither the general federal question statute nor the mandamus statute by itself waives sovereign immunity. *Washington Legal Found. v. United States Sentencing Comm'n*, 89 F.3d 897, 901 (D.C.Cir.1996); *Voluntary Purchasing Groups, Inc. v. Reilly*, 889 F.2d 1380, 1385 (5th Cir.1989). The *"Larson–Dugan* exception," however, holds that sovereign immunity does not apply as a bar to suits alleging that an officer's actions were unconstitutional or beyond statutory authority, on the grounds that "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949); *see also Dugan v. Rank*, 372 U.S. 609, 621–23, 83 S.Ct. 999, 1006–08, 10 L.Ed.2d 15 (1963); *Washington Legal Found.*, 89 F.3d at 901. If Swan's removal violated the NCUA statute, the *Larson–Dugan* exception would be triggered and hence no waiver of sovereign immunity is required here.[4]

Having resolved our jurisdiction to hear Swan's appeal, we turn now to a discussion of the central merits question in the case, namely whether the NCUA statute prevents the President from removing a holdover member of the NCUA Board, absent good cause.

### III. REMOVAL OF A HOLDOVER NCUA BOARD MEMBER

■ The NCUA statute does not expressly prevent the President from removing NCUA Board members except for good cause. The lack of an express for cause restriction does not dispose of the question of whether NCUA Board members are entitled to removal protection, however, for an examination of the NCUA's function, statutory language and legislative history may demonstrate that Congress nonetheless intended such removal protection to exist. *Wiener v. United States*, 357 U.S. 349, 353–56, 78 S.Ct. 1275, 1278–79, 2 L.Ed.2d 1377 (1958); *see also FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C.Cir.1993) (noting that it is likely the President can only remove FEC commissioners for cause despite statutory silence on removal), *cert. dismissed*, 513 U.S. 88, 115 S.Ct. 537, 130 L.Ed.2d 439 (1994). Since a restriction on the President's ability to remove NCUA Board members would represent a congressional limitation of presidential action, we can only find such a restriction if there is "affirmative evidence" that Congress intended it, for "[w]hen Congress decides purposefully to enact legislation restricting or regulating presidential action, it must make its intent clear." *Armstrong*, 924 F.2d at 289.

Swan contends that the 1978 amendments to the NCUA statute, which replaced the NCUA Administrator with the current NCUA Board and established that Board members would be appointed to nonrecurring six year terms, restricted the President's ability to remove NCUA Board members except for good cause. Prior law has, of

---

4. We note that the waiver of sovereign immunity contained in section 702 of the Administrative Procedure Act ("APA") would not apply in this case. Section 702 waives sovereign immunity in regard to actions seeking nonmonetary relief and claiming "that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702. It is not necessary that the suit be brought under the APA for section 702's waiver to apply. *Reich*, 74 F.3d at 1328. It might appear that Swan's complaint, as amended, meets the requirements of section 702, since he seeks injunctive or declaratory relief against officers and employees of the NCUA, which is an agency under the APA. But the action that Swan complains of, his removal, was performed by the President, and the President is not an agency within the meaning of the APA. *Franklin*, 505 U.S. at 800–01, 112 S.Ct. at 2775–76; *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C.Cir.1991).

course, established that term limits do not always provide removal protection, at least when traditional executive branch officials are involved. *See, e.g., Parsons v. United States,* 167 U.S. 324, 338–39, 17 S.Ct. 880, 885, 42 L.Ed. 185 (1897) (President can remove U.S. Attorneys even during their appointed four year terms). Swan argues, however, that the combination of fixed terms of office, the NCUA's status as an independent agency, the legislative history of the 1978 amendments and the agency's function as a regulator of financial institutions, together demonstrate that Congress clearly enacted term limits in this instance as a means of according the NCUA Board members protection against removal at will.

Swan does garner support for inferring some removal protection from the 1978 amendments to the NCUA statute. These amendments replaced the NCUA Administrator, who had explicitly served at the pleasure of the President, with a Board composed of three members, each of whom was appointed to a six year term, and deleted all reference to the President's removal powers. *See* H.R.REP. No. 1383, 95th Cong., 2d Sess. 138 (1978) (setting out text of NCUA statute prior to amendment and noting changes). The somewhat attenuated legislative history of the 1978 amendments goes further in bolstering that inference of removal protection during the term of Board members. There is little direct legislative history on Title V of FIRIRCA itself; FIRIRCA as a whole generated significant debate, but the alterations in the NCUA structure were not controversial. *See, e.g.,* 124 CONG. REC. 33,823 (1978) (no amendments offered to Title V, and no discussion of provision, during House debate). The provisions that became Title V were initially proposed as a floor amendment to an early Senate version of FIRIRCA. The sponsor of the floor amendment, Senator McIntyre, stated that "the principal thrust of this amendment is to transfer management of the [NCUA] from a single Administrator who serves at the pleasure of the President to a three- member board with fixed terms of office." 123 CONG. REC. 27,396 (1977). The House Report on FIRIRCA contains a very brief discussion of the NCUA alterations, and primarily notes that "[o]ther financial

institutions regulatory agencies and other independent agencies operate under the direction of a board" and cites the Federal Reserve System, the Home Loan Bank System, the FDIC, the Interstate Commerce Commission ("ICC") and the Federal Trade Commission ("FTC") as examples. H.R.REP. No. 1383 at 26. At the time, the Federal Reserve, FTC, and the ICC authorizing statutes all had for cause removal restrictions, while the Home Loan Bank and FDIC statutes were silent. 12 U.S.C. §§ 242, 1437, 1812; 15 U.S.C. § 41; 49 U.S.C. § 11 (repealed).

But the history of a predecessor bill, S. 3312, proposed in the 94th Congress, is revealing. S. 3312 was identical in all relevant respects to the 1978 amendments to the NCUA statute and it is apparent from the Senate Report on S. 3312 that the Senate Banking Committee believed the six year terms would protect NCUA Board members from at will removal during their appointed terms:

> The Administrator of the [NCUA] is the only Federal financial regulator to serve at the pleasure of the President without tenure. The lack of tenure tends to politicize the day-to-day decisionmaking process and raises the specter of not knowing whether taking a particular controversial position on a controversial issue might cost the Administrator his job.

> Ironically, the difficulties encountered by a nontenured Administrator were dramatically emphasized on the very day the Subcommittee on Financial Institutions held the hearing on [NCUA] restructuring. At the hearing, the Administrator himself acknowledged the difficulties inherent in serving without tenure.... Within hours after his appearance before the subcommittee, the Administrator was summoned to the White House and dismissed.

> At the very least, therefore, the committee recognizes the need to provide tenure for the Administrator in order to strengthen the [NCUA]'s status as an independent agency.

S.REP. No. 751, 94th Cong., 2d Sess. 3–4 (1976). As S. 3312 was proposed in the 94th

Congress, its legislative history is obviously not determinative of how Title V of FIRIRCA, enacted in the 95th Congress, should be read. But this legislative history is nonetheless to some degree instructive on Congress' intent in enacting Title V, given the virtual identity of the two statutes and indications in the legislative record that the text of Title V was in fact based on the earlier bill.[5]

We think it useful to trace this legislative background insofar as it contains support for NCUA Board members having protection against removal without cause during their appointed terms, since if no such protection exists during a member's term, there certainly would be no argument that a holdover member was so protected. But because the evidence is sufficiently ambiguous as not to permit us to discount the possibility that Congress did intend at least term protection, we must take our analysis one step further to determine whether Swan's holdover protection claim has any merit. Thus we will assume *arguendo* that Board members have removal protection during their appointed terms and focus instead on determining whether, even if that is so, holdover members are similarly protected. Although Swan argues that it should make little difference that a Board member is serving in a holdover capacity, we find the contention that holdover members should also be accorded removal protection to be a far more dubious, and ultimately unpersuasive, proposition.

As the foregoing discussion indicates, the strongest reason for according Board members any removal protection, in the absence of any express provision for it in the NCUA statute, is that Congress specifically amended the statute to create the Board and give its members fixed terms of office. It would seem to follow, then, that any such protection would automatically end once the specified term of office ended, unless there is some additional ground on which removal protection can be based. In *Wiener,* the Supreme Court stated that "the most reliable factor for drawing an inference regarding the President's power of removal ... is the nature of the function that Congress vested in" the body to which the removed officials belong. 357 U.S. at 353, 78 S.Ct. at 1278. If this function is one that "require[s] absolute freedom from Executive interference," *id.,* then a court may infer that Congress provided the officials with removal protection as a means of "prevent[ing] the President from exercising 'coercive influence'" over them. *Mistretta v. United States,* 488 U.S. 361, 411, 109 S.Ct. 647, 675, 102 L.Ed.2d 714 (1989) (quoting *Humphrey's Executor v. United States,* 295 U.S. 602, 630, 55 S.Ct. 869, 874–75, 79 L.Ed. 1611 (1935)). The NCUA is responsible for supervising federal credit unions and administering the insurance and liquidity funds, and the power to prescribe rules and regulations to accomplish these tasks and to manage the NCUA itself is vested in the NCUA Board. Independence from presidential control is arguably important if agencies charged with regulating financial institutions, such as the NCUA, are to successfully fulfill their responsibilities; people will likely have greater confidence in financial institutions if they believe that the regulation of these institutions is immune from political influence.[6] The NCUA's function may therefore provide

---

5. For example, the words that Senator MacIntyre used to describe the purpose of the changes in the NCUA organization he was proposing— "the principal thrust of this amendment is to transfer management of the [NCUA] from a single Administrator who serves at the pleasure of the President to a three-member board with fixed terms of office"—are identical with those contained in the Senate Report on S. 3312, except that the Senate Report used the word "legislation" instead of "amendment." S.Rep. No. 751 at 2. In addition, when Senator McIntyre proposed the amendment containing the NCUA organizational changes, he stated that the changes were the same as those that were contained in Title II ofS. 1665, which in turn incorporated the provisions of S. 3211. *See, e.g., NOW Accounts,*

*Federal Reserve Membership and Related Issues: Hearings Before the Subcomm. on Financial Insts. of the Comm. on Banking, Housing, Urban Affairs,* 95th Cong., 1st Sess. 127, 147 (1977) (Statement of C. Austin Montgomery, NCUA Administrator).

6. It merits noting, however, that the Comptroller of the Currency, who is responsible for implementing laws relating to the national currency and Federal Reserve notes, is subject to the general oversight of the Secretary of the Treasury, and, although appointed for a five year term, can be removed by the President "upon reasons to be communicated by him to the Senate." 12 U.S.C. §§ 1–2.

further evidence indicating that Board members enjoy removal protection during their appointed terms. But the function of the NCUA only provides a basis for extending removal protection to holdover Board members if protection for holdover members is necessary to ensure the NCUA's independence. An analysis of the position of holdover Board members demonstrates that this is not the case. Holdover members can be replaced, whether they have removal protection or not, by the President nominating and the Senate confirming their successors. As a result, a removal restriction will not protect holdover members from the aftermath of a Presidentially unpopular decision, and holdover members know that even if they cannot be removed directly, an unpopular decision may lead the President to nominate a successor immediately or encourage the Senate to speed up confirmation hearings. It is true that with removal protection holdover Board members would be less accountable to the President for their actions. But their lesser accountability to the President does not make them more independent. Rather, given that holdover members can be replaced whenever a successor is confirmed, all that removal protection achieves is to make holdover members more dependent on Senate inaction than on the President. The Senate would have the power to keep a holdover member in office by refusing to act on the President's nominee for a successor to a NCUA member.

As the NCUA's function fails to provide a basis for inferring removal protection for holdover Board members, we turn next to an examination of the language of the NCUA holdover clause. This clause is contained in

section 1752a(c), which describes the term of office of Board members:

> The term of office of each member of the Board shall be six years, except that the terms of the two members, other than the Chairman, initially appointed shall expire one upon the expiration of two years after the date of appointment, and the other upon the expiration of four years after the date of appointment. Board members shall not be appointed to succeed themselves except the initial members appointed for less than a six-year term may be reappointed for a full six-year term and future members appointed to fill unexpired terms may be reappointed for a full six year term. *Any Board member may continue to serve after the expiration of said member's term until a successor has qualified.*

12 U.S.C. § 1752a(c) (emphasis added). The final sentence of section 1752a(c) is the only reference to holdover Board members in the NCUA statute. Before the 1978 amendments, the NCUA statute contained a holdover clause in regard to the now-nonexistent NCUA advisory board. The language of the pre-amendment holdover clause was very similar to the current final sentence of section 1752a(c); like the current version, it was placed at the end of the subsection that described the terms of advisory board members. The only difference between the two is that the earlier version provided that a Board member could holdover until a "successor *has been appointed and* qualified." Act of March 10, 1970, Pub.L. No. 91–206, 84 Stat. 49, 50 (1970); *see also* H.R.Rep. No. 1383 at 138 (setting out pre-amendment version of the NCUA statute).[7]

---

7. It is worth noting that the NCUA holdover clause does not itself contain any term limits; rather the only term limit listed in the NCUA statute relates to the length of a Board member's appointed term. Congress frequently has included term limits that specifically apply to holdover officials; for example, the holdover clause that applies to members of the SEC provides that a commissioner can holdover until her successor is appointed and qualified, but cannot holdover "beyond the expiration of the next session of Congress" subsequent to the expiration of the commissioner's term. 15 U.S.C. § 78d(a); *see also* 5 U.S.C. §§ 1202(b), 1202(c); 7 U.S.C. § 4a(a)(1); 15 U.S.C. § 2053(b)(2); 39 U.S.C.

§ 202(b); 42 U.S.C. § 7171(b)(1); 42 U.S.C. § 2000e–4(a); 47 U.S.C. § 154(c); 49 U.S.C. § 701(b)(3). As discussed above, to the extent that Board members have any removal protection, it is because Congress gave them fixed terms of office. The absence of a term limit for holdovers could be read as evidence that Congress did not intend any removal protection, because if Congress had so intended, it would have given holdover members specific terms as it did appointed members. It could also be argued that the inclusion of a term limit would demonstrate that Congress actually considered the question of a holdover member's tenure and accepted that holdovers might remain in office for

The statutory text makes clear that NCUA Board members would have to step down at the end of their terms were it not for the holdover clause. Significantly, the NCUA statute not only provides that members shall be appointed to six year terms, but also specifies that Board members cannot be reappointed to succeed themselves if they have served a full term. This suggests that the primary purpose of the NCUA holdover clause, like the holdover clauses that appear in the statutes of many independent agencies, is to ensure continuity and avoid the leadership vacancies that otherwise would exist until successor officials could be appointed. *See* H.R.1917, 86th Cong., 2d Sess. 2 (1960) (recommending that holdover clauses be enacted to apply to the Federal Power Commission, the SEC, and the FCC because vacancies caused by the expiration of commissioners' terms cause delays and handicap agencies); *see also Staebler v. Carter,* 464 F.Supp. 585, 593 (D.D.C.1979) (reviewing congressional explanations as to why holdover clauses were included in the statutes of several independent agencies and concluding that "[t]he thrust of all the comments is that continuity in office is important and that the disruption caused by prolonged vacancies should be avoided."). Indeed, Swan does not argue to the contrary.

It is apparent, however, that removal protection for holdover Board members is not necessary to ensure agency continuity. Were holdover Board members freely removable, the President could replace removed holdover members when the Senate was in recess under the recess appointments clause, and could do so in regard to holdover members who were removed before the Senate went into recess as well as those members who were removed during the recess. *See* U.S. CONST., art. 2, § 2, cl. 3 ("The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session"); *United States v. Woodley,* 751 F.2d 1008, 1012–13 (9th Cir.1985) (en banc) (holding that recess appointments clause applies to all vacancies that exist when the Senate is in recess and noting that the courts and the executive branch have consistently adhered to this view), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1269, 89 L.Ed.2d 577 (1986); *United States v. Allocco,* 305 F.2d 704, 710 (2d Cir.1962) (interpreting the recess appointment clause to allow the President to fill only vacancies that arise during recess would "create . . . a manifestly undesirable situation" and "frustrate the commendable objective sought by the drafters"), *cert. denied,* 371 U.S. 964, 83 S.Ct. 545, 9 L.Ed.2d 511 (1963). Thus, extending removal protection to holdover members would be aiming a cannon at a gnat. It would serve only the limited purpose of avoiding the gap in agency leadership that could potentially result if the President were to remove a holdover official while the Senate was in session. Even assuming a successor was not quickly appointed via the usual nomination and confirmation process, such a gap itself would only last until the Senate next went into recess, a gap of limited duration at most.[8]

Removal protection for holdover members might be necessary if the purpose of the holdover clause were not just to prevent gaps in agency leadership generally, but more specifically to prevent gaps from occurring during the time it takes the Senate to confirm a successor—in other words, if the purpose of the holdover clause was to prevent a successor from being appointed via the recess appointment clause.[9] But there is

---

the specified period. But a term limit on holdovers serves primarily as a means of forcing the President and the Senate to move quickly on replacements, and thus the absence of such a limit is not a firm basis on which to conclude that Congress did not intend holdover members to have removal protection.

**8.** Indeed, if an intrasession recess is the same as an intersession recess as far as the President's recess appointments clause powers are concerned, this gap in leadership would be even shorter. *But see* Michael A. Carrier, *Note, When Is the Senate in Recess for Purposes of the Recess Appointments Clause?,* 92 MICH. L.REV. 2204 (1994) (arguing that intrasession recesses should not trigger the recess appointments clause).

**9.** As an initial matter, we note that removal protection would only preclude recess appointments if the end of a member's term did not create a vacancy for purposes of the recess appointments clause, regardless of whether the member assumed holdover status. As the split precedent in

no indication in the language of the NCUA statute or the legislative history of the 1978 amendments that Congress intended the holdover clause to serve any such purpose of precluding recess appointments. *Cf. Staebler,* 464 F.Supp. at 592 (although several congressional reports describe holdover clauses as allowing the Senate an opportunity to confirm successor officials, "in none of these reports is there any indication that the Committees considered, much less that they intended to rule out, the constitutionally-prescribed recess appointment option"). And we are unwilling to infer that the NCUA statute precludes the President from exercising a constitutionally granted power absent clear evidence that this was Congress' intent.

In fact, the textual changes in the holdover clause wrought by the 1978 amendments suggest the opposite, that Congress sought to make clear that the President could replace holdover officials using the recess appointment power. As detailed above, the pre-amendment version of the holdover clause provided that a Board member could holdover until a "successor has been appointed and qualified," while the current version states that a member can holdover until a "successor has qualified." There is no explanation in the legislative history as to why Congress so changed the wording of the holdover clause. It could be argued that "qualified" means confirmed when used in the phrase "appointed and qualified," since otherwise the words "and qualified" would be surplusage. *See, e.g., Wilkinson,* 865 F.Supp. at 893 (reading "appointed and qualified" in the LSC Act as "appointed and confirmed"). But there is no reason to give "qualified" such a narrow reading when the word is used alone. Rather, a more natural reading of "qualified" on its own would have it mean that the requirements for assuming office have been fulfilled, which could be

either by nomination with Senate confirmation or by recess appointment. *See, e.g.,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1858 (1976) (defining qualified as meaning primarily either "fitted ... for a given purpose" or "having complied with the specific requirements or precedent conditions (as for office or employment)"); *but see Mackie,* 827 F.Supp. at 56 (reading "qualified" to mean "nominated and confirmed"), *vacated as moot,* 1994 WL 163761 (D.C.Cir. Mar.9, 1994). Thus, the current version of the holdover clause is more compatible with the President's being able to replace holdover Board officials via the recess appointment clause than the pre-amendment version.

It is also worth noting that according holdover Board members removal protection might be pushing the constitutional envelope to the edge, because this protection could in practice serve to give the Senate control over holdover members' tenure in office or to preclude Presidents from being able to replace holdover members for substantial periods of time. If removal protection serves to preclude replacement of holdover Board members under the recess appointments clause, then the only way to remove holdover members would be to nominate and confirm successor members, and the Senate could keep holdover members in office by not acting on the President's nominations for successors. The Senate's power to keep holdover members in office in this fashion might well raise constitutional problems, since the Supreme Court has explicitly held that Congress cannot exercise control over the tenure of executive branch officials:

> Congress cannot reserve for itself the power of removal of an officer charged with the execution of the laws except by impeachment. To permit the execution of the laws to be vested in an officer answera-

the district courts of this circuit indicates, the meaning of "vacancy" in the recess appointments clause context is unclear. *Compare Wilkinson,* 865 F.Supp. at 902 (end of term of member of LSC Board does not create a vacancy) *and Mackie v. Clinton,* 827 F.Supp. 56, 57–58 (D.D.C. 1993) (end of term of member of Post Office's Board of Governors does not create a vacancy), *vacated as moot, .*1994 WL 163761 (D.C.Cir. Mar.9, 1994) *with McCalpin v. Dana,* No. 82–

542, (D.D.C. Oct. 5, 1982) (end of term of member of LSC Board creates a vacancy), *vacated as moot sub nom. McCalpin v. Durant,* 766 F.2d 535 (D.C.Cir.1985), *and Staebler,* 464 F.Supp. at 589–90 (end of the term of member of the Federal Election Commission creates a vacancy). It is not necessary for us to determine here whether a vacancy exists when an official's appointed term of office ends. *See Wilkinson,* 80 F.3d at 539.

ble only to Congress would, in practical terms, reserve in Congress control over the execution of the laws. *Bowsher v. Synar*, 478 U.S. 714, 726, 106 S.Ct. 3181, 3188, 92 L.Ed.2d 583 (1986); *see also Buckley v. Valeo*, 424 U.S. 1, 124–35, 96 S.Ct. 612, 685–90, 46 L.Ed.2d 659 (1976) (holding that Federal Election Commission was unconstitutional as constituted because, in part, four voting members were appointed as well as confirmed by Congress). Nor would the Senate's control over holdover Board members be a *de minimis* matter, since the absence of any term limit in the NCUA holdover clause enables holdover members to continue in office indefinitely, and in any event the Court has refused to tolerate any arrangements that could aggrandize the powers of Congress at the expense of the President, no matter how "innocuous" these arrangements might be in practice. *Metropolitan Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276–77, 111 S.Ct. 2298, 2312–13, 115 L.Ed.2d 236 (1991); *see also Bowsher*, 478 U.S. at 730, 106 S.Ct. at 3189–90 (likelihood of Congress actually exercising its removal power over the Comptroller–General is irrelevant to determining whether Comptroller–General can constitutionally exercise executive powers). In addition, if the President cannot remove holdover officials and cannot replace them under the recess appointments clause, then holdover members could conceivably remain in office for substantial, indeed unlimited, periods of time. While it is now beyond dispute that Congress generally may place restrictions such as term limits on the President's removal power, it is not clear that Congress can provide unlimited removal protection; in its opinions upholding removal restrictions the Court has repeatedly emphasized that the officials who were protected from removal had only a limited tenure. *Morrison*, 487 U.S. at 672, 691, 108 S.Ct. at 2609, 2619 (upholding restrictions on removal of independent counsel and underscoring that independent counsel has "limited jurisdiction and tenure"); *Wiener*, 357 U.S. at 350, 78 S.Ct. at 1276–77 (upholding removal protection for members of the War Crimes Commission and noting commissioners' tenure limited by three year life of the commission); *Humphrey's Executor*, 295 U.S. at 628–32, 55 S.Ct. at 874–75 (upholding restrictions on removal of FTC commissioners during appointed term); *see also Shurtleff v. United States*, 189 U.S. 311, 318, 23 S.Ct. 535, 537, 47 L.Ed. 828 (1903) (refusing to infer a restriction on the President's ability to remove a general appraiser of merchandise, despite a provision stating that the President could remove for cause, because the result of inferring a removal restriction would be to accord these officials life tenure). Precluding the President from removing an executive branch official with potentially unlimited tenure arguably might "impede the President's ability to perform his constitutional duty" under Article II to take care that the laws be faithfully executed. *Morrison*, 487 U.S. at 672, 691, 108 S.Ct. at 2609, 2619.

At oral argument, Swan's counsel contended that limiting the President's authority to remove holdover Board members is more in keeping with the constitutional plan because the normal appointment process envisioned by the Constitution is nomination by the President with confirmation by the Senate. On this view, since holdover members have been approved by both the President and the Senate at some point, allowing them to continue in office indefinitely is a lesser evil than allowing the President to deny the Senate any role in the appointment process by removing holdover members and replacing them with a succession of recess appointments. This argument rests on the assumption that a recess appointment is somehow a constitutionally inferior procedure, not entirely valid or in some way suspect, an assumption that the Constitution precludes us from making. The President is specifically granted the power to make recess appointments in the Constitution, and "the United States Supreme Court has unequivocally stated that '[t]he Constitution ... must be regarded as one instrument, all of whose provisions are to be deemed of equal validity.'" *Woodley*, 751 F.2d at 1009–10 (quoting *Prout v. Starr*, 188 U.S. 537, 543, 23 S.Ct. 398, 400–01, 47 L.Ed. 584 (1903)); *see also Staebler*, 464 F.Supp. at 597 ("There is nothing to suggest that the Recess Appointments

Clause was designed as some sort of extraordinary and lesser method of appointment, to be used only in cases of extreme necessity.").

Of course we do not opine on whether according removal protection to holdover NCUA Board members would be unconstitutional. But the fact that extending removal protection to holdover Board officials might raise constitutional problems makes us all the more unwilling to infer such protection absent clear evidence that Congress intended it. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397–98, 99 L.Ed.2d 645 (1988) ("Courts will not lightly opine that Congress intended to impinge on constitutionally protected liberties or usurp power constitutionally forbidden it."). Removal protection for holdover members is not necessary in light of the NCUA's basic functions, nor do the language of the holdover clause, the NCUA statute generally, and the legislative history of the 1978 amendments provide any evidence that Congress intended holdover members to have such protection.[10]

█ We therefore conclude that, even if the NCUA statute were interpreted to grant removal protection to Board members during their appointed terms (something we do not decide), this protection does not extend to holdover members. As Swan was serving in a holdover capacity when he was removed from his position as a NCUA Board member by President Clinton, his removal did not violate the terms of the NCUA statute.[11] The district court's decision granting sum-

mary judgment in favor of the government is therefore

*Affirmed.*

SILBERMAN, Circuit Judge, concurring:

I concur in the judgment but write separately because there is a good deal in the majority opinion that is problematic and quite unnecessary to our decision.

## I.

We must, of course, at the outset satisfy ourselves that we enjoy jurisdiction over appellant's claim. That depends on his having standing, which, in turn, depends on our ability to redress his alleged injury. The government argues that to do so we would have to issue an injunction or a writ of mandamus or a declaratory judgment (all carrying essentially the same constitutionally troubling characteristics) directed to the President of the United States. I agree with the majority that after *Franklin v. Massachusetts*, 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), we must focus first on appellant's requested relief. We are obliged to ask whether Swan's injury can be redressed without an order that is directed either implicitly or explicitly against the President, and if not, are we authorized to issue the order against the President. One difficulty I have with the majority opinion is that it discusses the troublesome second question when the answer to the first makes our consideration of the second question gratuitous. As the Supreme Court said in

10. Our colleague, in concurrence, chastises us for unnecessarily discussing the jurisprudential problems involved when a plaintiff seeks mandamus against the President, problems which lead us to accept less than complete relief as sufficient for the redressability prong of standing. We do so in the interests of candor, since we consider it, at the least, an unusual occurrence for an appellate court, without specific motion, to *sua sponte* add parties defendant. Additionally, we believe that our ruling on the removal of holdover Board members in this case requires full discussion of the many factors that enter into the calculus; unlike our colleague we do not feel comfortable with ruling that a holdover official can never have tenure until his successor is confirmed under any circumstances short of an express directive from Congress. Finally, we believe a

careful reading of our opinion will readily disabuse anyone of the notion that we are saying that "a President may be directed to do, or not to do, anything that any executive branch official can be directed to do by way of mandamus." Concurring opinion at 990.

11. Since we hold that Swan's removal was not unlawful, he does not have standing to challenge the President's appointment of Wheat during an intrasession recess of the Senate under the recess appointments clause. Even if Wheat's appointment were illegal, it did not cause Swan a cognizable injury. *See Allen*, 468 U.S. at 754, 104 S.Ct. at 3326 (a party must have suffered a cognizable injury to have standing and a violation of the "right to have Government act in accordance with law" is not a cognizable injury).

*Franklin,* 505 U.S. at 803, 112 S.Ct. at 2777, "we *need not decide* whether injunctive relief against the President was appropriate because we conclude that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone" (emphasis added). I think we could grant appellant all the relief he would ever need in this case, using only a little ingenuity, without ever attempting to impose judicial power directly on the President of the United States.

As the majority recognizes, by amending Swan's complaint, as he wishes, to extend it to more federal officials (in this instance, without any threat of unfairness), *see* Maj. Op. at n.3, and relying on our authority under the All Writs Act to issue our remedial order to "persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice," *United States v. New York Tel. Co.,* 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977), we can bring all the Board members, all the Board officials, *and* the Secretary of Treasury under our orders.[1] *Cf. Franklin,* 505 U.S. at 828, 112 S.Ct. at 2789–90 (Scalia, J., concurring in part and concurring in the judgment) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."). We could thus compel all officials at the Board to treat Swan as the rightful incumbent and, consequently, to ignore Wheat, at least officially. Moreover, the Secretary of Treasury could be directed to pay Swan's salary and not to pay Wheat a nickel in federal funds. If that hypothetical order would not give Swan complete relief, I would be very surprised indeed.

The majority nevertheless justifies discussing, at length (an exercise in judicial chest thumping?), our authority to direct the President, because the President might instruct the Secretary of Treasury not to obey our order or might somehow issue other instructions to executive branch officials to frustrate our mandate (which is the only

possible meaning to the phrase "were he to insist that Wheat and not Swan occupy the position of NCUA Board member...." Maj. Op. at 980). But that is simply another way of saying the President can always create a constitutional crisis of major proportions by directing subordinate executive branch officials to ignore the federal judiciary. One can only wonder, if any President would be willing to go that far—to encourage bald disobedience of judicial orders—what an order directed to the President himself would accomplish. At that point, we would be headed, in accordance with our temperament, either to the basement or the barricades. To give credence to that prospect is a good deal different than Justice Scalia's legitimate protest against the unseemly judicial arrogance involved in assuming that a President would voluntarily conform *his* behavior to a judicial decision when he is under no legal obligation to do so. *See Franklin,* 505 U.S. at 825, 112 S.Ct. at 2788 (Scalia, J., concurring in part and concurring in the judgment).

It may well be, as the majority would strongly suggest, Maj. Op. at 977–78, that a federal court may order the President to reverse an action or desist from action we determine is illegal, but the issue seems more complicated to me than it is put. The Supreme Court in the venerable case of *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 18 L.Ed. 437 (1866), declined to decide whether the President of the United States could be ordered to perform a purely ministerial act, but held that even if that were so, he could not be directed to perform or enjoined from performing duties that are purely "executive and political." *Id.* at 499. We have in previous cases, as the majority describes, on occasion said but never really held that a President could be ordered to perform a ministerial act. *See National Wildlife Fed'n v. United States,* 626 F.2d 917, 923 (D.C.Cir.1980); *National Treasury Employees Union v. Nixon,* 492 F.2d 587, 616 (D.C.Cir.1974). Particularly after *Franklin's* admonition that the "grant of injunctive relief against the President himself

1. We might be a good deal less willing to use this authority if it were not for our natural reluc-

tance to avoid serious constitutional questions.

is extraordinary and should ... raise[ ] judicial eyebrows," *Franklin,* 505 U.S. at 802, 112 S.Ct. at 2776, I do not think that dicta is worth very much, nor am I convinced that the ministerial/discretionary dichotomy which the majority would embrace is equivalent to the distinction drawn by the Supreme Court in *Mississippi v. Johnson* between ministerial on the one hand and "executive and political" on the other. The problem with the majority's formulation is that any time it is contended that the President has acted or intends to act illegally, it might be said that the President could not possibly enjoy such "discretion," therefore employing its ministerial/discretionary distinction leads inexorably to the proposition that a court can order the President to not violate or to cease violating a law. But, as the Court implicitly recognized in *Johnson,* whether such an order is phrased as an injunction—ordering the President not to take an allegedly illegal act—or positively—to perform a legally obliged duty—it trenches on the President's "executive and political" duties. That is why Justice Scalia's formulation that a President himself cannot be directed personally to perform or not perform *official* duties may be a more appropriate formulation. *See Franklin,* 505 U.S. at 826–27, 112 S.Ct. at 2788–89 (Scalia, J., concurring in part and concurring in the judgment).

In sum, the majority's implicit conclusion that a President may be directed to do, or not to do, anything that any executive branch official can be directed to do by way of mandamus, *see* Maj. Op. at 976–78, *i.e.,* a nondiscretionary act, which includes complying with the law is a rather far-reaching and perhaps dubious statement of constitutional law. I am uncertain as to its soundness, but I am quite sure there is no need to advance it in this case.

## II.

I am similarly of the view that the majority's treatment of the merits is unnecessarily labored—and plows jurisprudential fields that should remain undisturbed. We have never *held,* and need not do so in this case, that an appointee to a multi-member regulatory agency with a term appointment enjoys tenure equivalent to the term appointee who, according to the explicit terms of the statute, may not be removed except for good cause. It is certainly a logical assumption and we have assumed it before, *see, e.g., Federal Election Comm'n v. NRA Political Victory Fund,* 6 F.3d 821, 826 (D.C.Cir.1993), *cert. dismissed,* 513 U.S. 88, 115 S.Ct. 537, 130 L.Ed.2d 439 (1994), and I think we should assume it again here. But that assumption is predicated on the nature of a term appointment. Its most obvious purpose is to provide the incumbent with some measure of tenure or security against arbitrary removal.[2] Therein lies the difficulty in appellant's argument; after the term expires, the reason for the assumption expires as well. Unless, then, Congress indicates in the legislation itself that it intends some measure of job protection during the holdover period, which in this sort of situation—where Congress did not explicitly provide a good cause limitation on removal during the actual term—is virtually inconceivable, there is no reason at all to infer a congressional purpose to limit the President's removal power during the holdover period. Therefore, I think the majority's extended exposition on the function of the Board, the "need" *vel non,* as the majority sees it, for independence, the extensive discussion of legislative history, and the emphasis on the lack of a term limit in the NCUA holdover clause (which it seems to me would serve an entirely different purpose than the principal term limit) to be unnecessary to decide this case.

I agree that if Congress did try to limit a President's power to remove a member of a multi-member agency during a holdover period, it would raise serious constitutional problems. *See Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). But in this case, with the text of this holdover

---

**2.** *But see Parsons v. United States,* 167 U.S. 324, 17 S.Ct. 880, 42 L.Ed. 185 (1897) (holding that a four year term of appointment for United States Attorneys did not restrict the President's power to remove during that time). U.S. Attorneys are of course engaged, unlike most members of independent, or relatively independent regulatory boards or commissions, in a core executive function.

clause, I do not think there is any reason to worry about that hypothetical. There is not the slightest indication that Congress intended any limitation on the President's authority to remove a Board member after his or her term has expired.